*Tania Renee Wallace-Bey v. State of Maryland*, No. 476, September Term, 2016.
Opinion by Arthur, J.

**CRIMINAL LAW—BATTERED SPOUSE SYNDROME—EVIDENCE OF PSYCHOLOGICAL ABUSE**

Where a criminal defendant charged with murdering her boyfriend offered evidence of battered spouse syndrome to support a self-defense theory, the trial court committed prejudicial error by precluding the defendant and the defendant's psychological expert from testifying about any words spoken to the defendant by the deceased victim. On the fallacious premise that all testimony about words spoken by the victim was hearsay, the court granted a motion in limine to preclude the defense from introducing "any" words spoken by the victim. The court then repeatedly sustained objections to and granted motions to strike testimony about words spoken to her by the victim. The erroneous hearsay rulings could not be considered harmless because the combined effect of those rulings substantially impaired the presentation of the entire defense case.

The court should have denied the motion in limine because the court had no basis to evaluate whether the victim's declarations were assertions and whether they would be offered to prove the truth of the matters asserted. The court further erred by excluding testimony about orders or commands spoken by the victim, which were not assertions and thus could not be hearsay. The court erred even further by excluding testimony about various threatening, controlling, or demeaning remarks made by the victim, which were not offered to prove the truth of those remarks. The defendant's testimony about the victim's declarations was admissible because it was offered for the nonhearsay purpose of showing how the victim's words affected her decisions and mental state. The testimony was also admissible under the battered spouse syndrome statute (Md. Code (1974, 2013 Repl. Vol.), § 10-916 of the Courts Article), which permits the introduction of evidence of repeated psychological abuse of the defendant by the victim. The court should have permitted the psychological expert to disclose to the jury the defendant's reports of remarks that the victim made to her, for the purpose of illuminating the basis for the expert's opinion about the repeated psychological abuse.

**CRIMINAL LAW—BATTERED SPOUSE SYNDROME—EXPERT TESTIMONY**

Md. Code (1974, 2013 Repl. Vol.), § 10-916(b) of the Courts Article makes two types of evidence admissible in cases where a defendant charged with murder raises the issue of battered spouse syndrome: "(1) Evidence of repeated physical and psychological abuse of the defendant perpetrated by an individual who is the victim of a crime for which the defendant has been charged; and (2) Expert testimony on the Battered Spouse Syndrome." This statute does not expressly prohibit the defendant from introducing evidence that the defendant endured prior acts of abuse perpetrated by persons other than

the victim.  Evidence about a defendant's history of abuse perpetrated by other persons is relevant to the extent that it forms the basis for an expert's opinion about how that prior abuse affected the defendant's psychological condition during the defendant's abusive relationship with the victim and the defendant's mental state at the time of the offense.

Where a witness has been properly qualified to give expert testimony about battered spouse syndrome, the trial court should permit counsel to inquire about the connections (if any) between battered spouse syndrome and any related psychological conditions such as post-traumatic stress disorder and depression.  The expert testimony may address those connections in general and then in relation to conditions observed in a specific defendant.

## EVIDENCE—OPINIONS ON CREDIBILITY OF OTHER WITNESSES

During cross-examination of a criminal defendant, where a prosecutor asked the defendant whether she believed that a detective had been "lying" in his testimony about a statement she made to the detective, and where defendant objected on the ground that the question was argumentative, the trial court should have sustained the objection.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 476

September Term, 2016

_____

TANIA RENEE WALLACE-BEY

v.

STATE OF MARYLAND

_____

Nazarian,
Arthur,
Friedman,

JJ.

_____

Opinion by Arthur, J.

_____

Filed: November 2, 2017

In 2009 a Prince George's County jury convicted Tania Wallace-Bey of first-degree premeditated murder and the use of a handgun in the commission of a crime of violence in the shooting death of her boyfriend. The Circuit Court for Prince George's County sentenced her to imprisonment for life plus 20 years.

Five years later, the circuit court granted post-conviction relief, on the ground that Wallace-Bey had received ineffective assistance of counsel because her defense lawyer had failed to investigate whether she was suffering from battered spouse syndrome at the time of the shooting.

At a second trial in 2016, Wallace-Bey was convicted again of first-degree premeditated murder and the use of a handgun in the commission of a crime of violence. The court again sentenced her to life imprisonment for the murder conviction and to a consecutive term of 20 years for the handgun conviction.

Wallace-Bey noted a timely appeal and now presents two questions for review:

1. Did the circuit court impermissibly limit the testimony of [Wallace-Bey] and the defense expert?

2. Did the circuit court err in permitting the State to question [Wallace-Bey] about the credibility of another witness?

The answer to both questions is: Yes. First and foremost, we conclude that the circuit court committed prejudicial error by requiring Wallace-Bey to present the evidence that the victim repeatedly abused her without mentioning any words that he actually said to her. The judgments must be reversed on that basis alone. We shall address the other evidentiary issues to provide guidance for another trial.

FACTUAL AND PROCEDURAL BACKGROUND

## A.     The First Trial and the Related Post-Conviction Proceedings

At around 5:15 p.m. on October 24, 2007, Tania Wallace-Bey called 911. She reported that her boyfriend, Julius Whaley, had raped her and that she had shot him.

Police officers found Whaley's body on the floor of a bedroom inside his apartment. He had died hours earlier from a single gunshot to the chest.

Wallace-Bey told paramedics that she had tried to kill herself by ingesting sleeping pills and alcohol. The paramedics took her by ambulance to a hospital for treatment.

Detective Michael Lanier of the Greenbelt Police Department obtained oral and written statements from Wallace-Bey at the hospital. Later that night, Wallace-Bey gave another statement when she underwent a sexual assault forensic examination. In her statements, Wallace-Bey said that Whaley had raped her early that morning, that afterwards she shot him once, and that later she tried to commit suicide.

Upon visiting the residence in Philadelphia where Wallace-Bey had been living with her mother before the shooting, Detective Lanier discovered that Wallace-Bey had already been preparing to commit suicide in the days before she killed Whaley.

In December 2007, a Prince George's County grand jury indicted Wallace-Bey for first-degree premeditated murder of Whaley and the use of a handgun in the commission of a crime of violence. Although Wallace-Bey told her private defense counsel that Whaley had repeatedly abused her during the months leading up to the shooting, her counsel did not seek out an evaluation for battered spouse syndrome. Instead, counsel

relied on a theory of self-defense, without calling any witnesses. The jury found Wallace-Bey guilty on both counts, and the court sentenced her to life imprisonment plus 20 years.

After this Court affirmed the convictions on direct appeal, Wallace-Bey petitioned for post-conviction relief on several grounds, including ineffective assistance of counsel. At a post-conviction hearing, Dr. Patricia McGraw expressed her expert opinion that Wallace-Bey was suffering from battered spouse syndrome at the time that she shot Whaley.

The post-conviction court found that Wallace-Bey's trial counsel had rendered ineffective assistance by failing to investigate battered spouse syndrome. The court also found that counsel's inadequate performance prejudiced Wallace-Bey's defense. On March 13, 2014, the court vacated Wallace-Bey's convictions and granted her a new trial.

### B.      The State's Case Against Wallace-Bey

The circuit court held a jury trial over six days from March 14, 2016, to March 22, 2016. The trial focused on the events leading up to the shooting and Wallace-Bey's mental state during it. There was no dispute that Wallace-Bey caused Whaley's death by shooting him.

The State theorized that Wallace-Bey had killed Whaley as the first part of a murder-suicide plan. It contended that Wallace-Bey came to visit Whaley with the intention of killing him along with herself, that she shot him while he was asleep, and that her subsequent suicide attempt failed.

The defense claimed that Wallace-Bey shot Whaley to defend herself just after he

3

had forcibly raped her. The defense claimed further that she was suffering from the effects of repeated abuse by Whaley.

Throughout defense counsel's opening statement, the prosecutor made dozens of objections, many of which the court sustained. It appears that the court sustained objections to comments about anything that Whaley *said* to Wallace-Bey during their relationship, but overruled objections to comments about what Whaley *did* to her. For instance, the court sustained an objection to a comment that Whaley demeaned Wallace-Bey by telling her that she was "sick" and "destined for stagnation and failure," but overruled an objection to a comment that Whaley once "kicked her while she was on the ground."

The State established that at about 5:15 p.m. on October 24, 2007, police officers and paramedics responded to a 911 call, in which Wallace-Bey reported that her boyfriend had raped her and that she had shot him. When they arrived at the apartment building, Wallace-Bey came outside and "collapsed" onto the ground. The paramedic who treated her saw no signs of injury.

Upstairs, police officers found Whaley's body lying face-down in a pool of blood. He had sustained a single gunshot wound on the right side of his chest. The medical examiner determined that the gun's muzzle had been directly against his skin when it was fired. The bullet pierced the blood vessels connecting his right lung to his heart, which caused him to die within minutes.

On the bottom row of a bookshelf next to the body, investigators found a five-shot revolver. The hammer was pulled back by hand, ready to fire. The revolver had one

spent cartridge in its cylinder and four unspent rounds. Three more unspent rounds of ammunition were found on the floor on the other side of the mattress. Records showed that Wallace-Bey had purchased the revolver from a Pennsylvania dealer in April 2007, about six months before the shooting.

Investigators found an empty pill container on the floor near the body. Surveillance photos and purchase records showed that Wallace-Bey purchased sleeping pills from a nearby drug store at 8:30 a.m. on the morning of the shooting.

Outside the building, an officer recovered a grain alcohol bottle and a bag filled with personal items belonging to Wallace-Bey: her clothes, wallet, cosmetics, and toiletries. A manila folder inside the bag had phone numbers written on it for Wallace-Bey's parents and for the parents of "Amensa" (a name used by Whaley).

Also inside the bag was a pad of paper with bloody fingerprints on the front page. Tests later showed that the blood came from Whaley. Wallace-Bey had written a message on it, addressed to "Families (Amensa's and Tania's)." In the message, Wallace-Bey wrote that she was sorry "for hurting" them and asked for their forgiveness. She wrote that, "[o]ver the past year," her relationship with Whaley "became very unhealthy." In her words, "Amensa, ordinarily a man of good intentions and love, began to abuse [her,]" and she, "ordinarily a woman of substance and self-respect, began to accept the abuse willingly and frequently." She wrote that she made "numerous attempts to end the relationship," but that they "managed to find [themselves] in each other's arms – only to begin a new cycle of sickness [and] injury more grotesque than the previous." She said that there "appeared to be no hope in sight for [their] condition," that she

5

"couldn't see a way out," and that she "couldn't take it anymore."

Wallace-Bey was admitted to Doctors Community Hospital at around 6:00 p.m. on October 24, 2007. To treat the reported overdose, doctors administered activated charcoal. Soon thereafter, Detective Michael Lanier, the lead investigator, interviewed Wallace-Bey at the hospital. She signed a *Miranda* waiver form at 7:40 p.m.

Detective Lanier testified with the aid of his notes from the interview. According to the detective, Wallace-Bey stated that she had traveled from Pennsylvania to spend three days with Whaley in Maryland. On the previous night, they had gone to bed unclothed and set an alarm to wake up at 6:30 a.m. Before the alarm went off, Whaley woke her up and tried to have sex with her. She remarked to Whaley that that he was "swimming in pussy," meaning that there were other women with whom he could have sex. Whaley responded by grabbing her hair, pulling her to his side of the bed, and forcing her to have sex. According to Detective Lanier, Wallace-Bey said that, once Whaley fell asleep again, she retrieved her gun from her duffel bag and shot him.

At Detective Lanier's request, Wallace-Bey provided a handwritten statement, which she completed at 8:55 p.m. She wrote:

> After spending three blessed days together, things went awry. As we layed [sic] in Bed side-by-side, Amensa decided to have sex. I did not want to do it. Amensa grabbed me by the hair and began to assault me. He knew that it was excruciatingly painful, but he didn't care. With my right and left hands I tried to push him away. He said, "We're not having that! You need to learn to take the dick." He then constrained me and began to violently pound me. When he finished I was in such pain that I couldn't move. I rolled off of the bed, crawled to my bag, removed the pistol and shot him. . . .

Later that night, Wallace-Bey was transferred to Prince George's Hospital for a

6

sexual assault forensic examination. At trial, the forensic nurse testified that she examined Wallace-Bey at around 3:00 a.m. on October 25, 2007. Wallace-Bey disclosed to the nurse that she had had two previous pregnancies, which ended in one miscarriage and one abortion. She also disclosed that her most recent consensual sexual contact occurred two days before the reported sexual assault by Whaley. The nurse transcribed Wallace-Bey's description of the assault and shooting, which we quote verbatim:

> The attack happen on 10/24/07 early morning hours at Amensa Whaley (assailant) house. We were both asleep in bed or at least I thought he was asleep. He wanted to make love. I said no. He asked again and I said something that I should not have, I said that he was drowning in pussy. My hair was in a ponytail. He grabbed me by my ponytail and dragged me toward the left side of the bed and I fell off of the bed. He dragged me around the room by my hair. There was no one else in the house. When he dragged me around the bed, he pulled me back on the bed by my hair. He grabbed both my ankles and put my legs over my head. Then he enter me, pounding me really, really hard. I started screaming really loud, hoping that the neighbors would hear. I used both of my hands to push him so that he would stop from going inside me. I was pushing in his groin area. At that point he told me that I needed to learn how to take the dick. Somehow, after that I manage to roll off the bed and crawl across the floor where my bag was. That is where I had a gun. I shot him one time. Then he pushed me out of the bedroom into the hallway. As he was pushing me he said what are you doing, and then he collapsed to the floor. . . .

The forensic nurse observed no external injuries, but found "left and right side abrasions" inside the vaginal cavity, which Wallace-Bey said were "painful to the touch." The nurse testified that it was "possible" for a person to sustain those kinds of abrasions during sexual intercourse. During cross-examination, defense counsel established that the nurse had observed "similar" abrasions during other forensic examinations. Vaginal and cervical swabs collected during the examination tested positive for semen but negative for blood.

7

A few days after the shooting, Detective Lanier visited the house in Philadelphia where Wallace-Bey had been living with her mother. He later returned, with a search warrant, to take photographs and to collect items that Wallace-Bey's mother had showed him. The items included a small adhesive note that Wallace-Bey had left for her mother before she traveled to visit Whaley on October 21, 2007; the note said, "I am at Amensa's" and provided Whaley's address and cell phone number. The items also included a large envelope with the words "Tania's Last Will and Testament" written on it. The envelope contained the last four pages of a five-page, typewritten document, which included Wallace-Bey's requests for her memorial service and instructions for disposing of her property. As mentioned in the document, Wallace-Bey left a set of gift bags in the basement with labels for specific people.

On October 23, 2007, the day before the shooting, Wallace-Bey had mailed items to her mother's address from a post office in Hyattsville, Maryland. She sent a small envelope containing her birth certificate and bank deposit slips. Separately, she sent a package containing various personal effects (her purse, shoes, jewelry, and an iPod). Inside the box, Wallace-Bey also placed the first page of the five-page document expressing her last wishes. Wallace-Bey asked her friends and family to "forgive [her] choice to leave this earthly place." She wrote: "There have been some things that I have struggled with for a while and I just want to surrender it all now."

C.    **The State's Motions in Limine**

Before the defense called its first witness, the State made two motions in limine, which the court ultimately granted.

8

In the first motion, the State asked the court to "exclude any testimony as to any prior abuse by anybody other than the victim," Whaley. Defense counsel argued[1] that the evidence of past abuse would help the jury to evaluate Wallace-Bey's overall mental state and to assess her perception of a threat "through her eyes and in light of her experiences." The State argued that evidence of abuse of Wallace-Bey by anyone other than Whaley was irrelevant and inadmissible under the battered spouse syndrome statute: Md. Code (1974, 2013 Repl. Vol.), § 10-916 of the Courts and Judicial Proceedings Article ("CJP").

In the second motion, the State asked the court to exclude, "as hearsay," "any statements that [the] defendant would say that the victim in this matter said to her." The prosecutor did not specify the content of any of the "statements." Defense counsel responded that the defense would offer "any statements" made by Whaley to Wallace-Bey not "for the truth of the statements but for the statements['] effect on Ms. Wallace-Bey." Specifically, defense counsel asserted that the testimony would be offered "to show how those statements affected her mental state and her decision-making process[.]"

The prosecutor insisted that testimony about anything Whaley said to Wallace-Bey was "clearly hearsay." At the same time, the prosecutor admitted that Whaley's words were "being offered by the defendant to show that in her mind she was the victim and was a battered cohabitant[.]" In a contradictory fashion, however, the prosecutor then claimed that Whaley's words were "not being offered for the effect on Tania Wallace-

---

[1] Initially, the court did not require the State to argue in support of its motions. The court merely asked the prosecutor to repeat what categories of evidence she sought to exclude, and then the court immediately asked to hear from defense counsel.

9

Bey." The prosecutor concluded by saying: "They are being offered to show that he was saying these things to her. They are being offered for the truth to – to show for the truth of the matter asserted [sic]."

Without announcing its rationale, the court granted both motions. Defense counsel reiterated the objection for the record. At the court's direction, the clerk made a docket entry stating that the court granted the State's motion in limine to exclude "any Testimony to any Prior Abuse Other than the Alleged Abuse of the Victim" and the State's motion "that any Statements of [the] Victim are Hearsay[.]"

### D.     Testimony by Wallace-Bey

During the defense case, Wallace-Bey testified about two main topics: abuse that she suffered during her relationship with Whaley, and the events of October 24, 2007. In compliance with the court's ruling, defense counsel did not inquire about abuse by anyone other than Whaley.

Wallace-Bey testified that she first met Whaley in 1993, and within a year they began a romantic relationship. Whaley, who was studying to be a priest with the Ausar Auset Society, a Pan-African religious organization, rented a house in Philadelphia. Wallace-Bey moved in with him and joined the society. Wallace-Bey testified that, as a female member, she was expected to be "submissive" and "very receptive to the guidance and directions and the leadership of males in [their] family, or in [their] relationship." She testified that she ended the relationship after a few years because of what she called "[p]sychological abuse, emotional abuse and even spiritual abuse." She explained that, through Whaley's use of a "meditation and an oracle system," he dictated "what [she]

10

could do[,] [n]ot just in the relationship but in [her] life as a whole[,]" including what she could wear, what she could eat, and what friendships she could have.

In 1997, after their initial relationship ended, both Wallace-Bey and Whaley married other people. Wallace-Bey was divorced in 2002. Whaley remained married, but separated from his wife after a few years.

Whaley reconnected with Wallace-Bey in 2005. Over time, they resumed a romantic relationship. Whaley had changed his religious affiliation and had become a practitioner in the Yoruba tradition. He and Wallace-Bey sought premarital counseling from a Babalowo, whom Wallace-Bey described as a high priest in that tradition. Wallace-Bey decided to move in with Whaley because she believed that she needed to "[o]bey the counsel" that she received from the Babalowo.

On Valentine's Day of 2006, which was also Wallace-Bey's birthday, Whaley surprised her by renting an apartment for the two of them in Greenbelt. Wallace-Bey testified, however, that within a month Whaley assaulted her for the first time. She said that she had approached him to speak about something that she had found on a computer in the apartment. He reacted by grabbing her, holding her down so that she could not move, and forcibly penetrating her.[2]

Wallace-Bey testified that a second instance of abuse occurred at a hotel when Whaley dragged her along the floor to the bed and sexually assaulted her.

According to Wallace-Bey, the next incident occurred at their apartment in

---

[2] Wallace-Bey was about 5 feet, 6 inches tall and weighed around 155 pounds. Whaley was 6 feet, 3 inches tall and weighed around 220 pounds.

11

Greenbelt. Whaley blamed Wallace-Bey after he missed a flight. He shut her out of the bedroom, and she slept on the living room floor. In the middle of the night, he woke her up by kicking her in the side and back. He demanded that she take him back to the airport, and she obeyed. Afterwards, she changed the locks to the apartment and moved Whaley's belongings into his van. Thinking that he was "going to kill" her when he returned, she fled the apartment and went to stay with her mother in Philadelphia.

Wallace-Bey testified that Whaley eventually persuaded her to return to Greenbelt. A few days after her return, however, Whaley brought another woman to the apartment and had sex with her in the master bedroom, with the door open, while Wallace-Bey was in another room. Because Wallace-Bey needed clothes from the bedroom, she did not leave the apartment. After Whaley sent the other woman away, he returned to confront Wallace-Bey. He put her "in a headlock," dragged her down to the floor, and threatened to harm her if she moved.

At another point in 2006, Wallace-Bey went to the apartment to retrieve an item that she kept there. She changed her clothes in the apartment. While her shirt was over her head, Whaley grabbed it from behind so that her arms were immobilized. He tried to penetrate her, but she managed to escape before he was entirely successful. She then drove to what she thought was a secluded area and tried to commit suicide by stuffing items into the tailpipe of her car. A passerby interrupted her, and she drove away.

After staying at a friend's house for a period of time, Wallace-Bey started a new job as part of a music ensemble in the fall of 2006. She went on tour for a month, which led to another job touring with another company. While she was on tour, Whaley sent

her many text messages and voicemails. By conveying a message that he had received from the Babalowo, Whaley convinced her to meet him. They had dinner together in Delaware, reconciled, and had consensual sex at a hotel.

Wallace-Bey, who was 41 years old at the time, soon discovered that she was pregnant with Whaley's child. She informed Whaley of the pregnancy in February 2007 and returned with him to the Greenbelt apartment. On her first night back, after some guests left the apartment, Whaley immediately took her into a portable sauna to have sex. He did not physically force himself on her at that time, but she described her involvement as passive, saying that she "kind of just sat there."

A week later, Wallace-Bey began to experience cramping and severe bleeding. She went to a hospital and learned that she was having a miscarriage. She returned to the apartment, wearing padding under her clothes to absorb the blood. While she was lying face down on the couch, Whaley began to "smash[] the padding." He removed her clothes and penetrated her from behind. Later that night, Whaley "stopped [her] in the living room, picked [her] up, put [her] against the wall and sexually assaulted [her]" again. When she took a shower to clean herself up, "the remains came out."

In April 2007, Wallace-Bey and Whaley were trying to reconcile with one another. Wallace-Bey testified that she purchased a gun at that time after Whaley suggested that she carry one for her protection while she was on tour. She said that she kept the gun in a box at the bottom of her travel bag and took it with her whenever she was on the road.

Wallace-Bey became pregnant again by Whaley, but decided to terminate the pregnancy. In August 2007, she induced a miscarriage by undergoing an acupuncture

13

treatment that is unsafe for pregnant women. She did not tell Whaley about her abortion, which made her feel "[g]uilty," "[a]shamed," and "[d]eceptive" towards Whaley.[3]

Around the same time, Wallace-Bey decided to commit suicide. She did not want to use the gun and contemplated drinking poison instead. She sold her car, donated many of her belongings, and visited some old friends. She updated a document that she had written a few years earlier to express her last wishes. She also prepared gift bags to leave behind for some of her loved ones. Wallace-Bey testified that she did not want her mother to find her body.

On October 21, 2007, Wallace-Bey went by train from Philadelphia to visit Whaley, bringing her travel bag with her. She left a note with Whaley's phone number so that her mother "would be able to call [him] and find out what happened" to her. On October 23, 2007, she gathered her remaining possessions from the apartment and mailed them, along with her suicide note, from a post office to her mother's house. She selected the shipping method so that the package would arrive on October 26, 2007.

Wallace-Bey testified that early in the morning of October 24, 2007, Whaley woke her up by "yanking" and "tugging" her. Wallace-Bey recalled that she "kind of kicked him a little bit to the side." She remarked to him that he was "swimming in pussy" and that he did not need to have sex with her. She testified that Whaley responded by

---

[3] As a minor point in her brief, Wallace-Bey complains that the circuit court did not allow her to testify "about *what else* she felt besides shame when she underwent an amateur abortion." (Emphasis added.) The court had grounds to sustain the objection because that question had been asked and answered. Moments before, defense counsel had already asked her to describe how she felt after the abortion.

14

grabbing her by the hair and pulling down her underwear.  She said that, while she tried to push him away, Whaley grabbed her ankles and arms and held them together over her head.  Then he "forcefully penetrated" her.

Wallace-Bey testified that, after Whaley had finished raping her, she "curled up in a ball" for a few minutes.  He "tried to curl up behind [her] like spooning, but more like a tighter curl."  She pushed back against him with her elbow and then rolled off the bed.  She said that she threw some light objects towards him, and then she saw that her travel bag was open.  She reached inside it, grabbed her gun, closed her eyes, and fired one shot.  She said that she felt Whaley push against her arm as she was firing and that she heard him cry out, "[W]hat you doing?"

When asked why she shot him, Wallace-Bey said that she "had to stop him" because she "knew he was going to do it again."  She said that she "knew what to expect[,]" because "[i]t had gone on previous times."  She said that just before closing her eyes she saw Whaley leaning back and stroking his penis in order to obtain an erection, as she had seen him do other times.  She said that she "knew that he could do it repeatedly like he did when [she] was miscarrying[.]"

Wallace-Bey said that she lay down on the floor with Whaley as he died.  She pulled the hammer back on the gun to shoot herself, but put it down.  She stayed with him for a long time, praying over his body.  Then, she left to buy sleeping pills and alcohol, ingested them, and fell asleep.  She could not remember exactly when she wrote the note addressed to her family and to Whaley's family.  Eventually, she woke up and called 911.

15

### E.     The Restrictions on Wallace-Bey's Testimony

Throughout Wallace-Bey's testimony about the abuse allegedly perpetrated by Whaley, the court sustained objections and granted motions to strike whenever Wallace-Bey testified about things that Whaley allegedly said to her during their relationship.

In the first such ruling, Wallace-Bey was describing her first meeting with Whaley.  She started to say, "he told me that . . .[,]" but the prosecutor objected and the court sustained the objection before she finished the sentence.  A moment later, the court reminded the jurors to disregard any stricken testimony.

In light of the court's rulings, defense counsel began to narrow the scope of questions whenever the response might involve words spoken by Whaley.  For instance, defense counsel asked Wallace-Bey to describe the controlling behavior that Whaley exhibited during the early phase of their relationship "without telling" the people in the courtroom "about anything that [Whaley] may have said" to her.

Defense counsel asked Wallace-Bey to describe the first rape, which occurred after she confronted Whaley about something she found on his computer, without mentioning anything Whaley said.  She answered: "He gripped me up.  Gosh.  He sexually assaulted me.  He said something while he was doing it."

The court sustained the State's objection when Wallace-Bey began to speak about text messages and emails that Whaley sent, expressing his desire for her to come home after she fled the apartment.  Defense counsel instructed her to describe her understanding of what he communicated to her without mentioning what he actually said.

Defense counsel asked Wallace-Bey to describe, without mentioning anything that

16

Whaley said, the incident where Whaley physically assaulted her after having sex with another woman in their apartment. Moments later, Wallace-Bey started to testify: "He put me in a headlock and slowly took me down to the floor. When we got down to the floor he said . . . ." At that point, the State's attorney made another objection, and Wallace-Bey promptly apologized before the court ruled on the objection.

The court struck portions of Wallace-Bey's testimony about the incident in February 2007, on the first night that she returned to the Greenbelt apartment while she was pregnant. She testified that, immediately after their guests left, Whaley ordered her to "get naked." She also testified that Whaley held her and told her "you are not leaving" in order to keep her in the house that night. The court granted motions to strike her testimony about both of those utterances.

The court sustained another objection during Wallace-Bey's testimony about being raped on the morning of the shooting. She testified that, after Whaley pulled her hair and removed her underwear, "[h]e said 'you need to learn to take the dick.'" The prosecutor objected and moved to strike the testimony. Defense counsel pointed out that the State had already put the same words into evidence during its case-in-chief. Nevertheless, the court sustained the objection.[4]

After the direct examination of Wallace-Bey, defense counsel moved for a mistrial. Counsel contended that the court's restrictions on Wallace-Bey's testimony impaired her constitutional right to present evidence in her defense. Counsel argued that

---

[4] Later, the prosecutor elicited the same words during the cross-examination of Wallace-Bey.

17

the exclusion of anything that Whaley had said to Wallace-Bey prevented her from presenting evidence of psychological abuse that was relevant to the issue of battered spouse syndrome. Thus, according to defense counsel, the jury would "not be able to adequately evaluate" whether and how the abuse actually occurred. Defense counsel also argued that the court should have allowed Wallace-Bey to testify about her history of abuse by persons other than Whaley, as evidence of her mental state. The court denied the motion for mistrial.

During cross-examination, the State revisited many of the same topics that had been the subject of its objections. Wallace-Bey, who had now become conditioned to avoid mentioning any words spoken to her by Whaley, often gave vague responses. For instance, when the prosecutor asked her why she did not leave on the night when he put her in a headlock, she answered: "[B]ecause I'm barred from saying what he said, I will say that he said things that led me to believe that he would harm me if I moved."[5] At another point, the prosecutor inquired about the incident in which Whaley tried to force himself on her while she was changing her clothes, but she managed to escape (and afterwards tried to commit suicide in her car). Wallace-Bey testified that she "got out of the house but he was saying things to [her] at the same time." When asked about the night that he raped her twice while she was bleeding from her miscarriage, she testified: "He raped me the first time and made statements that implied that his intention was to make me bleed and I did not bleed so he did it again."

_____

[5] When the prosecutor persisted, by asking whether Whaley threatened her, she eventually stated that Whaley said, "I'm going to jack you up."

## F.   Expert Testimony on Battered Spouse Syndrome

After Wallace-Bey testified, the State moved to preclude any expert testimony on battered spouse syndrome, arguing that Wallace-Bey's testimony did not establish a pattern of abuse by Whaley.  The court denied that motion.  The court then allowed Dr. Patricia McGraw, a clinical and forensic psychologist, to testify for the defense as an expert in forensic psychology.[6]

Dr. McGraw had interviewed Wallace-Bey on three different occasions between 2013 and 2015, for approximately 20 hours in total.  Dr. McGraw obtained information from Wallace-Bey about her family background, career, education, religious beliefs, history of suicide attempts, relationships with Whaley and other men, and the events surrounding the shooting of Whaley and her attempted suicide.  Dr. McGraw described Wallace-Bey as "cooperative" and "tearful" and opined that her responses remained "consistent" throughout the three interviews.  Dr. McGraw testified that Wallace-Bey "scored in the genuinely responding range" on three psychological tests meant to detect "malingering," i.e., fabricating or exaggerating her reported symptoms for an external incentive.

Dr. McGraw concluded that Wallace-Bey suffered from "battered spouse syndrome" as defined under Maryland law as "the psychological condition of a victim of repeated physical and psychological abuse" by a current or former spouse or cohabitant.  She also concluded that "but for the battered spouse syndrome at the time of the incident

---

[6] Sometime before trial, Dr. McGraw changed her last name to McIlvride.  The parties continued to refer to her as Dr. McGraw.

and the cumulative effects of the abuse by Mr. Whaley over the many years of their relationship . . . the events in question would not have occurred."

Dr. McGraw discussed the general nature of battered spouse syndrome and compared the repeated abuse in Wallace-Bey's relationship with Whaley to the cycle of abuse that characterizes other intimate relationships that involve battering. She opined that Wallace-Bey never permanently withdrew from her relationship with Whaley, despite being assaulted multiple times in 2006 and 2007, because she came to believe (as a result of Whaley's influence and her religious views) that she did not have the right or ability to make her own decisions. According to Dr. McGraw, the "cumulative" effect of abuse over time distorted Wallace-Bey's thinking, causing her to feel trapped even though she might appear to be free to leave the relationship.[7]

During Dr. McGraw's testimony, the court continued to enforce its prohibition on admitting words spoken by Whaley. The court struck Dr. McGraw's testimony that Whaley told Wallace-Bey "that she was quote tainted and flawed and had this weakness and therefore was not a suitable mate." Defense counsel encouraged Dr. McGraw to "go on without saying his exact words." The court sustained four more objections while Dr. McGraw attempted to describe psychological abuse in the form of Whaley's controlling behavior, in which he "insisted" that she do certain things and "claimed" that he was

---

[7] The court ultimately precluded Dr. McGraw from answering questions specifically about how Wallace-Bey's condition would have affected her actions on the morning of the shooting. The court apparently sustained the State's objections on the ground that Dr. McGraw was offering an opinion on the ultimate issue. Wallace-Bey has not challenged that ruling in this appeal.

20

"divinely ordained" or "the police of God."

In rebuttal, the State called Dr. Christiane Tellefsen as an expert in forensic psychiatry. Dr. Tellefsen had evaluated Wallace-Bey based on her review of reports from Dr. McGraw and other doctors and her discussions with Wallace-Bey on three occasions during the six months before the trial. Dr. Tellefsen explained that Wallace-Bey did not cooperate fully with the evaluation until the third interview.

Dr. Tellefsen opined that Wallace-Bey "does not suffer from battered spouse syndrome." As the "most important" reason for her conclusion, Dr. Tellefsen relied on Wallace-Bey's "independence" from Whaley, which Dr. Tellefsen said was "not consistent" with the degree of independence of other women who had battered spouse syndrome. In Dr. Tellefsen's view, most women suffering from battered spouse syndrome are "financially dependent on their abuser" or physically "isolated from the rest of society." By contrast, Dr. Tellefsen said that Wallace-Bey had the ability to be financially independent, to make her own decisions, and to live apart from Whaley. Dr. Tellefsen diagnosed Wallace-Bey with borderline personality disorder and opined that she was "suffering from an episode of depression" at the time of the shooting.

### G.    **The Conclusion of the Trial**

At defense counsel's request, the court instructed the jury on the elements of perfect and imperfect self-defense. The court declined to give a special instruction that defense counsel had proposed on battered spouse syndrome, but instead read an

instruction based on one proposed by the State.[8]

During its closing argument, the State repeatedly argued that Wallace-Bey shot Whaley while he was asleep and while he could not have posed a threat to her. The State theorized that Wallace-Bey killed Whaley because she was "fueled by jealousy."

Defense counsel argued that battered spouse syndrome affected Wallace-Bey's mental state and that she shot Whaley only "because she had to and she felt like she had to and that was her only way out." In rebuttal, the State argued that Wallace-Bey was not a rape victim at all and that her account of abuse was nothing more than a "performance" as part of an entirely "made up" defense.

The jury began deliberating on the morning of March 22, 2016. At 12:10 p.m., the jury asked to listen to the recording of Wallace-Bey's 911 call and to review a copy of the instructions about the definitions of first-degree murder and second-degree murder. The jury returned its verdict at 2:30 p.m. It found Wallace-Bey guilty of first-degree premeditated murder and the use of a handgun to commit a crime of violence.

On May 3, 2016, the trial judge sentenced Wallace-Bey to life imprisonment for the first-degree murder conviction. The trial judge also sentenced her to a consecutive term of 20 years of imprisonment for the handgun conviction, which is the maximum

---

[8] The court instructed the jury as follows: "You have heard testimony regarding the battered spouse syndrome. Battered spouse syndrome means the psychological condition of a victim of repeated physical and psychological abuse by a spouse, cohabitant, or former cohabitant. You must first decide whether or not Tania Wallace-Bey suffered from this syndrome. If you find that she did, you may consider that in deciding her motive or state or mind or both as to perfect or imperfect self-defense regardless of use of excessive force, failure to retreat or who was the first aggressor."

sentence for that offense. Wallace-Bey noted this timely appeal from the judgments.

DISCUSSION

I.      **Exclusion of Testimony by Wallace-Bey and Dr. McGraw**

As her primary challenge in this appeal, Wallace-Bey contends that the circuit court impermissibly limited her own testimony and that of Dr. McGraw, the defense expert on battered spouse syndrome. She argues that, through a series of erroneous rulings, "the trial court deprived the jury of critical information it needed to meaningfully consider Dr. McGraw's testimony and Ms. Wallace-Bey's self-defense claims."

Wallace-Bey's briefs identify three categories of evidentiary rulings: (1) the in limine ruling and subsequent rulings that barred Wallace-Bey and Dr. McGraw from mentioning any words spoken by Whaley; (2) the in limine ruling precluding those two witnesses from testifying about Wallace-Bey's history of abuse by persons other than Whaley; and (3) various other rulings precluding those two witnesses from testifying about other matters related to battered spouse syndrome. Because each of her contentions concerns evidence of battered spouse syndrome, it is necessary to begin with some background information about Maryland law as it relates to that issue.

A.      **Battered Spouse Syndrome as Recognized Under Maryland Law**

Wallace-Bey relied on a self-defense theory as her defense to the charge of first-degree murder. Maryland law recognizes two varieties of self-defense: perfect (or complete) self-defense and imperfect (or partial) self-defense. *State v. Smullen*, 380 Md. 233, 251 (2004) (citing *State v. Marr*, 362 Md. 467, 472 (2001)). Where a defendant generates an issue of self-defense as a defense to murder, the State must prove beyond a

reasonable doubt that the defendant did not act in perfect or imperfect self-defense. *Porter v. State* (*Porter II*), 455 Md. 220, 236 (2017) (citing *Dykes v. State*, 319 Md. 206, 217 (1990)).

"Perfect self-defense is a complete defense to murder, and thus, 'if credited by the trier of fact, results in an acquittal.'" *Porter II*, 455 Md. at 235 (quoting *Smullen*, 380 Md. at 251). Perfect self-defense consists of the following elements:

> (1) The accused must have had reasonable grounds to believe himself in *apparent* imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;
>
> (2) The accused must have in fact believed himself in this danger;
>
> (3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and
>
> (4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

*Smullen*, 380 Md. at 252 (quoting *Marr*, 362 Md. at 473) (emphasis in *Smullen*).

The elements of imperfect self-defense are similar to those of perfect self-defense, except where those elements require "an *objectively reasonable* belief that [the defendant] was in apparent imminent danger of death or serious bodily harm from the assailant, requiring the use of deadly force." *State v. Peterson*, 158 Md. App. 558, 586 (2004) (citing *Marr*, 362 Md. at 473) (emphasis in original). A defendant can establish imperfect self-defense, without showing that she had reasonable grounds to believe that she was in imminent danger, as long as she shows that she actually believed that she was in imminent danger. *Porter II*, 455 Md. at 235 (citing *Smullen*, 380 Md. at 252). A defendant who used objectively unreasonable force can still establish imperfect self-

24

defense if she shows that she actually believed that the force used was necessary to prevent the apparent imminent danger. *Porter II*, 455 Md. at 235 (citing *Smullen*, 380 Md. at 252). In short, the doctrine of imperfect self-defense looks at the elements of self-defense under an "'honest but unreasonable belief standard[.]'" *Porter II*, 455 Md. at 257 (quoting *State v. Faulkner*, 301 Md. 482, 499 (1984)). Imperfect self-defense "does not constitute a justification for the killing" (*Smullen*, 380 Md. at 252), but mitigates the offense from murder to voluntary manslaughter. *Porter II*, 455 Md. at 257 (citing *Faulkner*, 301 Md. at 486).

Maryland law recognizes that evidence of the psychological condition known as battered spouse syndrome may be relevant to the state-of-mind elements of perfect and imperfect self-defense. *See Peterson*, 158 Md. App. at 587. CJP § 10-916(a)(2) defines "'Battered Spouse Syndrome'" as "the psychological condition of a victim of repeated physical and psychological abuse by a spouse, former spouse, cohabitant, or former cohabitant which is also recognized in the medical and scientific community as the 'Battered Woman's Syndrome.'" The statute provides:

> (b) Notwithstanding evidence that the defendant was the first aggressor, used excessive force, or failed to retreat at the time of the alleged offense, when the defendant raises the issue that the defendant was, at the time of the alleged offense, suffering from the Battered Spouse Syndrome as a result of the past course of conduct of the individual who is the victim of the crime for which the defendant has been charged, the court may admit for the purpose of explaining the defendant's motive or state of mind, or both, at the time of the commission of the alleged offense:
>
> (1) Evidence of repeated physical and psychological abuse of the defendant perpetrated by an individual who is the victim of a crime for which the defendant has been charged; and

25

(2) Expert testimony on the Battered Spouse Syndrome.

CJP § 10-916(b).

This statute "does not . . . create a new defense to murder[,]" but instead it permits a defendant to introduce certain evidence of battered spouse syndrome "in support of the state of mind element of perfect or imperfect self-defense, *i.e., . . .* to prove the honesty and reasonableness of the defendant's belief that he or she was in imminent danger at the time of the offense." *Banks v. State*, 92 Md. App. 422, 429 (1992).

Before the enactment of CJP § 10-916 in 1991, trial judges often treated evidence of battered spouse syndrome as irrelevant. *Id*. The overall "intent of the statute was to 'clarify that the court has discretion to admit evidence'" related to battered spouse syndrome. *Porter II*, 455 Md. at 238 (quoting Senate Judicial Proceedings Comm., Floor Report on House Bill 49, 401st Sess. (Md. 1991)); *see also Smullen*, 380 Md. at 259.

In its opinions analyzing this statute, the Court of Appeals has discussed the writings of Dr. Lenore Walker, the clinical psychologist widely credited with first recognizing the psychological impact of intimate-partner violence. *Porter II*, 455 Md. at 236-37; *Smullen*, 380 Md. at 253-54. Dr. Walker used the term "battered woman" to mean "one who is repeatedly subjected to any forceful physical or psychological behavior by a man in order to coerce her to do something he wants her to do without any concern for her rights." *Smullen*, 380 Md. at 253. "In her study of abusive relationships, Dr. Walker discovered three phases in the 'cycle of violence': (1) 'the period of tension-building'; (2) 'the acute battering incident'; and (3) 'the period of loving-contrition or absence of tension.'" *Porter II*, 455 Md. at 237 (quoting Lenore E.A. Walker, *Battered*

*Women Syndrome and Self-Defense*, 6 Notre Dame J.L. Ethics & Pub. Pol'y 321, 330 (1992)).

The tension-building phase involves "minor incidents of physical, sexual or emotional abuse" of the woman, wherein "the batterer begins to express hostility toward her." *Smullen*, 380 Md. at 253 (citations omitted). The second phase occurs when the batterer "unleashes a barrage of verbal and physical aggression that can leave the woman severely shaken and injured." *Id.* at 254 (citation and quotation marks omitted). During the contrition phase, "the batterer apologizes, seeks forgiveness, and promises to change[,]" and that behavior persuades the woman to remain in the relationship. *Id.* (citation omitted). This cycle repeats, often becoming "more intense, frequent, and violent" over time. *Peterson*, 158 Md. App. at 589; *see Smullen*, 380 Md. at 254.

The Court of Appeals has identified two aspects of this condition that are important in cases where a defendant claims that she killed an abusive partner in self-defense. The first is the phenomenon that has been "described as 'learned helplessness,' – where, after repeated abuse, women come to believe that they cannot control the situation and thus become passive and submissive." *Smullen*, 380 Md. at 254 (citation omitted). Expert testimony about the effects of battering can explain "'why the defendant, having been previously subjected to abuse, simply did not leave the home or take some other action against her abuser.'" *Porter II*, 455 Md. at 238 (quoting *Smullen*, 380 Md. at 254-55).

The second key aspect of this condition is the defendant's heightened sensitivity to the abuser's behavior. *Smullen*, 380 Md. at 255; *Peterson*, 158 Md. App. at 589. "'The

27

cyclical nature of an intimate battering relationship enables a battered spouse to become expert at recognizing the warning signs of an impending assault from her partner – signs frequently imperceptible to outsiders.'" *Banks*, 92 Md. App. at 429 (quoting Testimony of Judith A. Wolfer, Legal Director of the House of Ruth, Hearings on House Bill 49 before the House Judiciary Committee (Feb. 27, 1991)); *see Smullen*, 380 Md. at 260. The repeated abuse by the batterer can cause the defendant "to 'recognize a threat of imminent danger from conduct that would not appear imminently threatening to someone who had not been subjected to that repetitive cycle of violence.'" *Porter II*, 455 Md. at 238 (quoting *Smullen*, 380 Md. at 270-71). Testimony about this psychological response can explain "why the defendant perceived a threat from objectively non-threatening conduct on the part of the victim and why, though *apparently* the aggressor, the defendant was actually responding to perceived aggression by the victim." *Smullen*, 380 Md. at 271 (emphasis in original).[9]

In sum: "When a defendant claiming self-defense offers foundational evidence which, if believed, would establish the requisite pattern of abuse sufficient to provide a base for an expert opinion as to the battered [spouse] syndrome, it should be admitted, so that it can be followed by the expert testimony." *Id.* at 273. If credited, that evidence could explain "why and how, in light of that pattern of abuse, the defendant could

---

[9] By allowing evidence of battered spouse syndrome even in cases where the woman appears to be the first aggressor, the General Assembly recognized that a battered woman "might **actually** fear imminent danger during a break between violent episodes[,]" such as when the batterer is asleep. *Porter II*, 455 Md. at 246 (emphasis in original).

honestly, and perhaps reasonably, perceive an imminent threat of immediate danger." *Id.*

As the State points out here, CJP § 10-916(b) states that the trial court "may" admit certain evidence on battered spouse syndrome. Nonetheless, "[t]his discretionary aspect must be taken with some caution." *Smullen*, 380 Md. at 261 n.8. "If, because an adequate foundation for it has been established, [battered spouse] syndrome evidence is relevant and is properly offered, the court *must* admit it[.]" *Id.* (emphasis in original).

### B.      Testimony About Words Spoken by Whaley to Wallace-Bey

To explain her mental state at the time of the killing, Wallace-Bey offered evidence of repeated abuse by Whaley. To that end, she sought to recount many comments that, she said, Whaley made to her during physical acts of abuse and at other times throughout their relationship. Wallace-Bey contends that the circuit court erred by ruling in limine that she could not introduce testimony about "any statements" allegedly made to her by Whaley. She contends that the court further erred by sustaining the repeated objections to testimony about particular things that Whaley allegedly said to her. Wallace-Bey argues that the testimony was offered to show the effect of Whaley's alleged comments on her, "namely, how they instilled in her a sense of fear and coercive control by Whaley." She also argues that her testimony about Whaley's comments was admissible as evidence of "psychological abuse" in addition to the physical and sexual assaults.

The circuit court granted the State's motion in limine expressly on the ground "that any Statements of [the] Victim [we]re Hearsay." The court then sustained the many objections to and motions to strike the testimony about things Whaley said, apparently on

29

hearsay grounds. Just as the prosecutor did at trial, the State asserts that this testimony was inadmissible under the rule against hearsay.

Maryland Rule 5-802 prohibits the admission of hearsay, unless it is otherwise admissible under a constitutional provision, statute, or another evidentiary rule. Unlike many rulings on the admissibility of evidence, which are reviewed for abuse of discretion, the issue of "[w]hether evidence is hearsay is an issue of law reviewed *de novo*." *Parker v. State*, 408 Md. 428, 436 (2009) (quoting *Bernadyn v. State*, 390 Md. 1, 8 (2005)); *see Gordon v. State*, 431 Md. 527, 533 (2013).

Rule 5-801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Under this definition, testimony is not hearsay merely because the witness testifies about words spoken by another person outside of court. "The threshold questions when a hearsay objection is raised are (1) whether the declaration at issue is a 'statement,' and (2) whether it is offered for the truth of the matter asserted." *Stoddard v. State*, 389 Md. 681, 688-89 (2005). "If the declaration is not a statement, or it is not offered for the truth of the matter asserted, it is not hearsay and it will not be excluded under the hearsay rule." *Id.* at 689.

As used in the definition of hearsay, the term "statement" means either "an oral or written assertion" or "nonverbal conduct of a person, if it is intended by the person as an assertion." Md. Rule 5-801(a). This Rule does not attempt to define what constitutes an "assertion," but instead it leaves that concept to be developed in case law. *See McClurkin v. State*, 222 Md. App. 461, 480 (2015) (citing Committee Note to Md. Rule 5-801). The

30

case law establishes that, "where the probative value of words, as offered, depends on the declarant having communicated a factual proposition, the words constitute an 'assertion' of that proposition." *Stoddard*, 389 Md. at 703 (footnote omitted).

An out-of-court declaration is not necessarily hearsay merely because it qualifies as an assertion (and thus as a "statement"). *See, e.g.*, *Holland v. State*, 122 Md. App. 532, 544 (1998). "As [the hearsay] definition makes plain, whether an out-of-court statement is hearsay depends on the purpose for which it is offered at trial." *Dyson v. State*, 163 Md. App. 363, 373 (2005). Evidence of a statement is not hearsay unless it is "offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801(c). This phrase is a convenient shorthand, which "[i]f amplified for clarity, . . . would read 'offered in evidence to prove [at trial] the same truth of the matter that was asserted by the declarant at the time he or she made the out-of-court statement.'" *Handy v. State*, 201 Md. App. 521, 539 (2011) (emphasis removed) (quoting 6A Lynn McLain, *Maryland Evidence: State & Federal* § 801:1(C), at 14-15 (2d ed. 2001)).

In its motion in limine at the outset of Wallace-Bey's defense case, the State requested a categorical ruling that vastly exceeded the scope of the rule against hearsay. The State requested that Wallace-Bey "not be able to testify to *any words* that the victim," Whaley, "said to her." (Emphasis added.) Aside from identifying Whaley as the declarant, the State offered no details about any of the declarations that it sought to exclude. The State supplied no information for the court to evaluate whether any of the unspecified declarations were "assertion[s]" by Whaley and thus "statement[s]" within the meaning of Rule 5-801(a). The State insisted that Whaley's words would be "offered

for the truth," but said nothing about what "truth" Whaley was asserting or what "truth" Wallace-Bey would be attempting to prove. The State did not come anywhere close to meeting its burden on its motion in limine. The court should have summarily denied the State's unfounded motion.

The State's indiscriminate campaign to exclude all words spoken by Whaley to Wallace-Bey brings to mind the following observation by Judge Moylan: "When a witness testifies as to words spoken by some other person on some other occasion, it has become, sadly, a Pavlovian reflex among lawyers to leap to their feet and yell, 'Hearsay!'" *Holland*, 122 Md. App. at 543. That "reflex," according to Judge Moylan, "is frequently as nonsensical as it is automatic." *Id.* "To qualify as hearsay, the words recounted in court must, for starters, constitute an assertion or statement of a fact[,]" and "[i]t is further required that the out-of-court assertion be offered for the truth of the thing asserted." *Id.* at 543-44. Accordingly, a trial court should never exclude evidence as hearsay solely because a witness attempts to testify about something that someone allegedly said outside of the courtroom.

Beyond the erroneous hearsay ruling, Wallace-Bey contends that the trial court further erred when it sustained the series of objections to and granted the motions to strike her testimony about certain words uttered by Whaley. At those points, the trial court had sufficient information to evaluate whether those declarations were "assertion[s]" by Whaley and whether Wallace-Bey was offering them "to prove the truth of the matter asserted" within the meaning Rule 5-801. The evidence was not hearsay.

Specifically, Wallace-Bey points to her testimony about things Whaley said when

32

she returned to the Greenbelt apartment after becoming pregnant in early 2007. The court struck her testimony that Whaley ordered her to remove her clothes as soon as their guests left by saying, "get naked." The court also struck her testimony that Whaley ordered her not to leave the apartment that night by holding her and telling her, "you are not leaving." Without any elaboration, the State asserts that this testimony was hearsay.

In general, orders and commands are not factual assertions. *See* 6A Lynn McLain, *Maryland Evidence: State & Federal* § 801:4, at 188 n.4 (3d ed. 2013) (noting that "commands, etc., are not assertions" under Maryland evidentiary rules). By illustration, "'[t]he out-of-court command, "Stop!" can be, by its very nature, neither true nor untrue,'" so it does not qualify as an assertion. *Fair v. State*, 198 Md. App. 1, 18 (2011) (quoting *Holland*, 122 Md. App. at 544). Likewise, instructions and warnings such as "Don't do that, or else" or "Watch your step" are not assertive. *See Burgess v. State*, 89 Md. App. 522, 537-38 (1991); *see also Garner v. State* (*Garner I*), 183 Md. App. 122, 138-39 (2008), *aff'd*, 414 Md. 372 (2010). A command, absent some indication that it communicates something other than its literal meaning, does "'not assert a proposition that could be true or false[,]'" and so it cannot "'be offered for [its] truth because [it] would not be assertive speech at all.'" *Garner v. State* (*Garner II*), 414 Md. 372, 388 (2010) (quoting *United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009)).[10]

---

[10] Grammatical form is not dispositive on the issue of whether something is an assertion. *See Stoddard*, 389 Md. at 709. Ordinarily, however, "[f]or an out-of-court utterance to qualify as an assertion, it [should] be in the indicative or declarative mood, rather than in . . . the imperative mood[.]" *Holland*, 122 Md. App. at 543-44; *see also Fair*, 198 Md. App. at 18.

To the extent that the two declarations "get naked" and "you are not leaving" were orders, they were not assertions. To the extent that those declarations included any assertions, Wallace-Bey did not offer that evidence to prove that what Whaley said was true. The words "get naked," might conceivably be hearsay if offered to prove through implication that the target of the command was wearing clothes when the command was given. In the context of this case, however, Wallace-Bey offered that evidence to recount how Whaley demanded to have sex with her that night. Wallace-Bey testified that Whaley said "you are not leaving" in response to questions about what Whaley did that night to dissuade her from leaving. The probative value of the testimony did not depend on Whaley's sincerity or accuracy. As defense counsel correctly argued, her testimony was probative to explain how Whaley's words affected her.

Wallace-Bey argues that the court further erred by striking her testimony that, just before Whaley raped her on the morning of the killing, he "said 'you need to learn to take the dick.'" The State again insists that this statement was hearsay, but conspicuously fails to make any effort to explain how the statement could possibly satisfy the definition of hearsay. Even if Whaley's alleged remark were an assertion of some kind, defense counsel certainly was not offering that testimony to prove the "truth" of whatever vile message he was allegedly asserting. Defense counsel introduced that statement to show how Wallace-Bey understood that Whaley was going to rape her at that time. The decision to strike that testimony was particularly aberrant, because Wallace-Bey's testimony about those words was important to evaluating her perception that Whaley would assault her again when she shot him minutes later. *See generally Marr*, 362 Md. at

34

478-79 (quoting *Jones v. State*, 182 Md. 653, 660 (1944)) (explaining that, where the evidence generates an issue of self-defense, the defendant "'may give in evidence whatever he knew of the character, prior conduct, threats or other utterances" to show that the victim appeared to be dangerous).[11]

Although the State objected to this category of testimony ostensibly on hearsay grounds, the prosecutor suggested an additional rationale while arguing for the successful motion in limine. The prosecutor maintained that it was "unfair" for Wallace-Bey to "say that the victim said all these things with no possible way for the State to rebut" her testimony, because Whaley was dead. Yet this complaint about evidence of things Whaley allegedly *said* to Wallace-Bey in private could just as easily be made about her testimony about things Whaley allegedly *did* to her. The Maryland Rules do not bar admission of nonhearsay simply because the opposing party is unable to call the declarant to confirm or deny whether he actually made a declaration. Wallace-Bey is competent to testify about things that she claims to have personally heard Whaley say to her for the purpose of explaining how those words affected her. For that purpose, she may recount his exact words if she remembers them. The State can attack her testimony both through

---

[11] In addition to those three rulings, Wallace-Bey asserts that the court precluded her, on hearsay grounds, from testifying that Whaley "refused to accept the couple's first breakup" in 1997. Defense counsel had asked her to explain "the status of [her] relationship" with Whaley at that time. She responded: "I had broken up with him, but he refused to accept that." When she started to add, "As the leader in the relationship, as the male . . .[,]" the State made a general objection, which the court sustained. From the transcript, we cannot discern the basis for the court's ruling, which could have been unrelated to the hearsay rulings. Defense counsel made no proffer of what Wallace-Bey would have said if she had been allowed to finish her sentence. We are unable to conclude that the court erred in this ruling or that Wallace-Bey suffered prejudice from it.

cross-examination and through other evidence that might draw her credibility into question. It is up to the jury to decide whether to believe or not to believe what she says.

Testimony about words spoken by the victim to the defendant can be particularly probative in cases where the defendant raises the issue of battered spouse syndrome. All three phases of the cycle of violence at the center of the syndrome may involve words in addition to actions: expressions of hostility during the tension-building phase; "verbal aggression" during acute battering incidents; and apologies, requests for forgiveness, and promises to change in the contrition phase. *See Smullen*, 380 Md. at 253-54. Moreover, the statute specifically allows a defendant to introduce not only evidence of "physical" abuse but also evidence of "psychological abuse of the defendant" by the victim. CJP § 10-916(b)(1).

Although the statute does not define the term "psychological abuse," this Court has reasoned that verbal conduct may be evidence of psychological abuse. In *State v. Peterson*, 158 Md. App. at 564, this Court upheld a post-conviction court's conclusion that a defendant received ineffective assistance in her trial for the fatal shooting of her husband because her counsel failed to pursue a defense based on battered spouse syndrome. The Court rejected the State's argument that the issue of battered spouse syndrome was not available to trial counsel where the abuse was "at times physical and psychological, and at other times only psychological[.]" *Id.* at 593. The Court wrote that the "psychological abuse of the [defendant]" intensified as her husband threatened to kill the defendant, expressed to her his desire to kill other women, and "threatened to rape the [defendant] because she would not sleep with him." *Id.* at 591-92. *Peterson* supports

36

Wallace-Bey's contention that the words allegedly spoken by Whaley to Wallace-Bey were essential to explaining the nature of her psychological abuse.[12]

A purpose for introducing that evidence of abuse was to establish the foundation for "[e]xpert testimony on the Battered Spouse Syndrome." CJP § 10-916(b)(2); *see Smullen*, 380 Md. at 273. Here, defense counsel asked the expert forensic psychologist, Dr. McGraw, to describe "what kind of abuse" Wallace-Bey reported that she experienced during her relationship with Whaley. As part of her response, Dr. McGraw opined that "the abuse was mainly psychological" during the first period of Wallace-Bey's relationship with Whaley. When Dr. McGraw attempted to describe that abuse, the court consistently barred her from mentioning Wallace-Bey's reports of any words spoken by Whaley: that he "insisted" that she do certain things; told her "that she was quote tainted and flawed and had this weakness and therefore was not a suitable mate"; and "claimed" that he was "divinely ordained" or "the police of God."[13]

Wallace-Bey contends that the trial court erred by precluding Dr. McGraw from testifying about these comments made by Whaley. Although the court did not announce

---

[12] Similarly in *Porter v. State* (*Porter I*), 230 Md. App. 288, 294-95 (2016), *rev'd*, 455 Md. 220 (2017), this Court characterized evidence that a defendant's spouse not only beat her but also "threatened to kill her on several occasions, . . . made demeaning and derogatory statements to her[,] . . . harassed her at work, forced her to stand at their kitchen sink and drink water until she urinated on herself" as evidence of repeated "physical, verbal, and psychological abuse."

[13] In her brief, Wallace-Bey also argues that the court prevented Dr. McGraw from testifying that Wallace-Bey reported that Whaley "pressured" her to marry him. The transcript shows that the State objected on hearsay grounds, but the court actually overruled that objection and allowed Dr. McGraw to proceed. Evidently, the court overruled that objection because the testimony was not presented as Whaley's words.

the basis for its rulings, those rulings followed necessarily from the court's threshold determination that any words allegedly spoken by Whaley to Wallace-Bey were hearsay.

The State argues here that those rulings "were correct because the testimony constituted double hearsay." *See generally* Md. Rule 5-805 ("[i]f one or more hearsay statements are contained within another hearsay statement, each must fall within an exception to the hearsay rule in order not to be excluded by that rule"). But even though these portions of Dr. McGraw's testimony involved two out-of-court declarants, with Dr. McGraw recounting Wallace-Bey's report of what Whaley said, the excluded testimony did not contain hearsay within hearsay. It included no hearsay from Whaley. As explained previously, an utterance from Whaley "insist[ing]" that Wallace-Bey do something is not even an assertion. *See Holland*, 122 Md. App. at 544; *see also Garner II*, 414 Md. at 388. Wallace-Bey was not attempting to prove that Whaley spoke the truth when he allegedly called her an "[un]suitable mate" or said that she was "tainted and flawed." Nor was she attempting to prove the truth of Whaley's alleged claims that he was "divinely ordained" and "the police of God." The defense offered testimony about those comments for the appropriate purpose of illuminating Dr. McGraw's opinion about psychological abuse from Whaley that Wallace-Bey suffered. The court duplicated its earlier error by continuing to rule that everything spoken by Whaley to Wallace-Bey was inadmissible hearsay.[14]

---

[14] Testimony about what Wallace-Bey reported during her interviews with the psychological experts could potentially involve one layer of hearsay if it were offered to prove that the abuse occurred. Nevertheless, the testimony about Wallace-Bey's reports

Perhaps because of the indefensibility of the absurd position that the prosecution persuaded the trial court to adopt, the State makes almost no effort to explain how Whaley's reported statements could possibly have been hearsay. Instead, the State argues, at some length, that Wallace-Bey suffered no prejudice from these evidentiary rulings.

In the State's view, the court's rulings "restricted only a small portion of the evidence that Wallace-Bey wanted to present." The State contends that, for each of the rulings on the individual objections, defense counsel managed to elicit similar testimony, albeit usually without the use of Whaley's exact words. Despite the State's extraordinary efforts to prevent the jury from hearing about any words allegedly spoken by Whaley, the State now suggests that the excluded testimony could not have affected the jury's evaluation of Wallace-Bey's self-defense claim. The State's suggestion is unpersuasive.

As Wallace-Bey aptly notes in her reply brief, the State's harmless-error argument simply ignores the prejudice resulting from the in limine determination. When a trial court grants a motion in limine to exclude a category of evidence and clearly intends for its decision to be final, the ruling ordinarily can be reviewed on appeal even if the proponent of the evidence makes no further effort to offer the excluded evidence later

---

of abuse to the experts can (and should) be disclosed to the jury because her reports formed the basis for their expert opinions. *See* Md. Rule 5-703(b); *see also* Md. Rule 5-705. Upon request, the court should instruct the jury to use those disclosed facts only for the purpose of evaluating the expert opinions. *See* Md. Rule 5-703(b). Just as the court permitted the expert witnesses to discuss Wallace-Bey's reports of physical and sexual abuse by Whaley, the court also should have permitted the experts to disclose her reports of psychological abuse through Whaley's verbal conduct.

during the trial.  *See Church v. State*, 408 Md. 650, 662 (2009); *Prout v. State*, 311 Md. 348, 355-57 (1988) (interpreting Md. Rule 4-323(c)), *abrogated on other grounds as recognized in Beales v. State*, 329 Md. 263, 269 (1993); *Maslin v. State*, 124 Md. App. 535, 540-41 (1999).  "'To require defense counsel," after the grant of the State's motion in limine, "'to make a more specific proffer or to offer the evidence again during the trial in order to preserve the issue for appellate review is unwarranted and would unduly interfere with the orderly progression of the trial.'"  *Hall v. State*, 233 Md. App. 118, 130 (2017) (quoting *Simmons v. State*, 313 Md. 33, 38 (1988)).  Contrary to the State's suggestion, Wallace-Bey's appellate challenge is not confined to the handful of erroneous rulings on specific objections.

Once a defendant demonstrates error in a criminal case, reversal is required "'unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict[.]'"  *Dionas v. State*, 436 Md. 97, 108 (2013) (quoting *Dorsey v. State*, 276 Md. 638, 659 (1976)).  The Court has observed:

> "An evidentiary or procedural error in a trial is bound, in some fashion, to affect the delicately balanced, decisional process.  The abnegation of a particular rule upon which the defense intended to rely may often inflict more damage than initially apparent; a meritorious line of defense may be abandoned as a result; an important witness may not be called; strategies are often forsaken.  The future course of the trial inevitably must be changed to accommodate the rulings made.  It is the impact of the erroneous ruling upon the defendant's trial and the effect it has upon the decisional process which is of primary concern . . . ."

*Hunter v. State*, 397 Md. 580, 596 (2007) (quoting *Dorsey*, 276 Md. at 657-58).

"'Harmless error review is the standard of review most favorable to the defendant

40

short of an automatic reversal.'" *Porter II*, 455 Md. at 234 (quoting *Bellamy v. State*, 403 Md. 308, 333 (2008)). "[W]here credibility is an issue and, thus, the jury's assessment of who is telling the truth is critical, an error affecting the jury's ability to assess a witness' credibility is not harmless error." *Dionas*, 436 Md. at 110 (citations omitted).

The transcript reveals that the exclusion of an entire category of evidence substantially impaired the presentation of Wallace-Bey's defense. The erroneous rulings affected the subject matter and form of defense counsel's questions, the content of the answers from the two main defense witnesses, the ability of those two witnesses to give complete responses during cross-examination, and the arguments available during closing.

We agree with Wallace-Bey that the excluded evidence "would have provided the jury a much fuller picture" of the basis for Dr. McGraw's opinion and that the restrictions "made it easier for the State to promote the conclusion of Dr. Tellefsen," the State's expert. The jury heard a muted version of the defense case instead of the version that Wallace-Bey had the right to present under Maryland law. In a case where the verdict depended on the jury's assessment of Wallace-Bey's credibility and the relative weight to be assigned to the competing expert opinions, we cannot come anywhere close to saying that the erroneous hearsay rulings had no effect on the outcome. *See Smith v. State*, 423 Md. 573, 598-99 (2011) (holding that erroneous exclusion of evidence that could have supported the defense theory of the case was not harmless); *see also Simmons*, 313 Md. at 48 (holding that trial court committed reversible error through in limine ruling excluding expert psychiatric testimony that could have persuaded the jury that the defendant was

guilty of a crime less than murder). Reversal is required here because the combined

errors from the in limine hearsay ruling and from the rulings on subsequent hearsay

objections were not harmless.[15]

Because this case is being remanded for another trial, we will address the

remaining issues to provide guidance on remand. *See, e.g.*, *Taylor v. State*, 226 Md. App.

317, 371 (2016).

### C.     Evidence of Abuse of Wallace-Bey by Persons Other than Whaley

At the outset of the defense case, the State moved to "exclude any testimony as to

any prior abuse" of Wallace-Bey by persons other than Whaley. According to the

prosecutor, defense counsel's opening statement had suggested that the defense expert

would testify about abuse that Wallace-Bey suffered during her childhood. Specifically,

defense counsel had mentioned that Wallace-Bey's mother was "verbally and physically

abusive" to her and that her mother's boyfriend was "physically, verbally[,] and sexually

abusive" with her.

Opposing the motion to exclude testimony on those matters, defense counsel

argued that the evidence of Wallace-Bey's history of abuse would help the jury assess the

---

[15] Wallace-Bey contends that the erroneous rulings "unfairly blunted" her defense to such a degree that they deprived her of the right to present witnesses in her own defense, as protected by the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights. In light of our conclusion that the court made prejudicial errors on matters of Maryland evidence law, we need not address whether the rulings also amounted to a constitutional violation. *See Anderson v. State*, 420 Md. 554, 566 n.1 (2011) (applying the principle that an appellate court will not reach a constitutional issue when a case can properly be disposed of on other grounds); *Williams v. State*, 416 Md. 670, 695 (2010) (same); *Myer v. State*, 403 Md. 463, 475 (2008) (same).

reasonableness of her actions "through her eyes and in light of her experiences[,]" which were "not limited to experiences" of abuse by Whaley. Defense counsel also argued that the evidence of prior abuse was probative of Wallace-Bey's overall mental state and, particularly, the reasons why she was depressed and suicidal. The State contended that CJP § 10-916 did not permit the introduction of evidence of abuse of a defendant by anyone other than the victim. The State argued further that "whatever happened to [Wallace-Bey] when she was young is completely not relevant" to the case and would only serve to "inflame the jury's sympathy for her[.]"

The court granted the motion without announcing the grounds for its ruling. In compliance with that ruling, defense counsel did not ask Wallace-Bey about abuse she suffered as a child and did not ask Dr. McGraw about how that prior abuse informed her opinion on the issue of battered spouse syndrome. On appeal, Wallace-Bey contends that the trial court erred by granting the motion.

The ruling under review here involved both the interpretation of CJP § 10-916 and a determination of relevance. Where an evidentiary ruling turns on a question of statutory interpretation, the interpretation of the statute is subject to de novo review. *See Allen v. State*, 440 Md. 643, 667 (2014). The determination of whether an item of evidence is legally relevant under Md. Rule 5-401 – i.e., whether the evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" – is also subject to de novo review. *See State v. Simms*, 420 Md. 705, 724-25 (2011).

As previously mentioned, CJP § 10-916(b) makes two types of evidence

43

admissible in cases where a defendant charged with murder raises the issue of battered spouse syndrome: "(1) Evidence of repeated physical and psychological abuse of the defendant perpetrated by an individual who is the victim of a crime for which the defendant has been charged; and (2) Expert testimony on the Battered Spouse Syndrome." The State contends that evidence of abuse of Wallace-Bey "by persons other than Whaley was *inadmissible* under the statute." (Emphasis added.) In the State's view, the language permitting evidence of abuse "perpetrated by an individual who is the victim of a crime for which the defendant has been charged" (CJP § 10-916(b)(1)) implies that evidence of abuse perpetrated by anyone else is inadmissible.

The statutory language does not support that negative inference. CJP § 10-916(b)(1) makes certain evidence admissible, but it does not bar the introduction of evidence of any kind. The statute is silent as to whether the court may admit evidence of abuse of the defendant by persons other than the victim. Evidence of that kind of abuse, while not made admissible by subsection (b)(1), could still be admissible under some other provision or theory of relevance.

Wallace-Bey's argument focuses on subsection (b)(2), which permits the introduction of "[e]xpert testimony on the Battered Spouse Syndrome." CJP § 10-916(b)(2). Wallace-Bey notes that the statute "does not specify that expert testimony on the syndrome may only pertain to abuse carried out by the victim against the accused."[16]

---

[16] In the *Porter* case, a defendant offered evidence of battered spouse syndrome in support of her self-defense claim where she had hired someone to murder her husband. The defendant testified that she had been exposed to domestic abuse as a child while

44

In her brief, Wallace-Bey relies on a report prepared by Dr. McGraw in 2013 in connection with the post-conviction proceedings after Wallace-Bey's first trial. That report makes it clear that Wallace-Bey's exposure to traumatic experiences, including childhood sexual abuse, was a cornerstone of Dr. McGraw's conclusion about how battered spouse syndrome affected Wallace-Bey's actions during the shooting. Citing published research, Dr. McGraw opined that Wallace-Bey's history of abuse made her vulnerable to being in a relationship in which she "re-experienced the pattern of domestic violence she had been exposed to in childhood." According to Dr. McGraw, medical literature indicates that a history of being battered can have a "direct effect" on a battered woman's "state of mind and her appraisal of danger[.]" Dr. McGraw added that persons with long histories of trauma respond to threats "in the context of the sum total of their total traumatic life experiences" and that the "cumulative effect of violence" can "severely alter[]" a person's "ability to cope with a threat[.]" In Wallace-Bey's brief, she cites other research about the "cumulative effects of a history of abuse" on a person's response to perceived threats.

By linking the evidence of Wallace-Bey's history of abuse to the basis for Dr. McGraw's expert opinion, the argument in Wallace-Bey's brief sufficiently establishes the relevance of that evidence. Indeed, the components of Dr. McGraw's report that

---

living with her mother and her mother's boyfriend. *Porter I*, 230 Md. App. at 294. The defense expert on battered spouse syndrome testified about that childhood exposure in the process of explaining how the defendant's background made her vulnerable to certain psychological disorders. *Id.* at 301. The opinion does not disclose whether the State objected to the admission of that testimony.

45

discuss Wallace-Bey's history of other abuse pertain to the two aspects of battered spouse syndrome (learned helplessness and heightened sensitivity) that are most probative to the elements of perfect and imperfect self-defense. Information about that prior abuse could have assisted the jury in evaluating the validity and probative value of Dr. McGraw's opinion. In addition, the information may have helped explain why Dr. McGraw reached a conclusion that was different from that of the State's expert, Dr. Tellefsen.

As the State accurately points out, however, Wallace-Bey did not articulate this theory of relevance to the trial judge. Trial counsel made a vague reference to the need to assess Wallace-Bey's actions "through her eyes and in light of her experiences." Her counsel did not inform the trial judge that Wallace-Bey's history of abuse was central to Dr. McGraw's opinion or that other research that supported her opinion. By contrast, Wallace-Bey's brief now treats her factual testimony about her childhood history of abuse and Dr. McGraw's expert testimony about the effect of that abuse as a single unit.

Neither portion of the excluded testimony was *independently* relevant. It is unclear how a jury of laypersons could infer anything of consequence from Wallace-Bey's history of abuse without some expert analysis about how that abuse would have affected her later actions. Likewise, an expert opinion about the effect of that abuse would not be probative without a foundation to establish that the abuse actually occurred. The proffer of relevance at trial failed to connect the cause (the history of abuse) with its effect on Wallace-Bey's mental state at the time of the killing.

On remand, if Wallace-Bey offers evidence that she was abused by persons other than Whaley as the foundation for an expert opinion about how that abuse affected her

psychological condition and mental state, and if defense counsel articulates the theory of relevance that she advanced in this appeal, then the trial court should admit the evidence for that purpose over the State's relevancy objection. Wallace-Bey's testimony should then be followed by the expert testimony, which the court should also admit over any relevancy objection.

Of course, as the State points out, a trial court has discretion to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Md. Rule 5-403. On remand, if the State objects, the trial court must weigh the probative value of this evidence against these countervailing concerns to decide in the first instance exactly how much testimony of prior abuse to admit. The probative value of the evidence of prior abuse largely depends on how important (or unimportant) those facts were in the expert's ultimate evaluation. If Dr. McGraw's 2013 report is any indication, it would appear that Wallace-Bey's history of abuse during her childhood heavily informed her expert's conclusions.

The State fairly points out that "protracted evidence" about abuse that Wallace-Bey suffered when she was young poses some risk of confusing or misleading the jury about the issues before them. Certainly, the testimony about Wallace-Bey's history of abuse by others should not be as lengthy or as detailed as the testimony about abuse inflicted by Whaley. The guiding principle in deciding how much testimony to admit on that subject is the following: the evidence should be admitted to the extent that it is

47

necessary for the jury to understand and to meaningfully evaluate the expert opinions.

"Only with the basis for the expert testimony revealed will the jury be able to properly

weigh the evidence." *Simmons*, 313 Md. at 42; *see Smullen*, 380 Md. at 273.

### D.    Relevance of Other Evidence Related to Battered Spouse Syndrome

In addition to the exclusion of evidence targeted by the two motions in limine,

Wallace-Bey contends that the trial court at other times "impermissibly limit[ed]" certain

testimony from Dr. McGraw and from herself based on a "narrow understanding" of what

evidence is relevant in a case involving battered spouse syndrome.

Wallace-Bey complains that the trial court prevented Dr. McGraw from testifying

about various topics related to battered spouse syndrome. The following excerpt, from

the direct examination of Dr. McGraw, is a representative sample:

> [DEFENSE COUNSEL]: When was the idea of battered spouse syndrome
> first sort of developed?
>
> [DR. McGRAW]: The original research was by –
>
> [THE STATE]: Objection.
>
> THE COURT: Sustained.
>
> [DEFENSE COUNSEL]: Dr. McGraw, can you please explain what the
> similarities are between battered spouse syndrome and post traumatic
> disorder?
>
> [THE STATE]: Objection.
>
> THE COURT: Sustained.
>
> [DEFENSE COUNSEL]: How did the diagnosis of battered spouse
> syndrome, what did that have – how was that associated with the
> depression or how might that be associated with depression?

48

[THE STATE]:  Objection.

THE COURT: Sustained.

[DEFENSE COUNSEL]:  Your Honor, may we approach?

THE COURT:  No, sir.

[DEFENSE COUNSEL]:  What other psychological conditions did you note for Ms. Wallace-Bey?

[THE STATE]:  Objection.

THE COURT:  Sustained.

[DEFENSE COUNSEL]:  Did you note that Ms. Wallace-Bey was also depressed?

[THE STATE]:  Objection.

THE COURT:  Sustained.

[DEFENSE COUNSEL]:  Was there any other psychological condition that you tested for?

[THE STATE]:  Objection.

THE COURT:  Sustained.

*     *     *

[DEFENSE COUNSEL]:  Are there certain psychological conditions that make a person more susceptible to battered spouse syndrome?

[DR. McGRAW]:  Yes.

[THE STATE]:  Objection.

THE COURT:  Sustained.

Wallace-Bey contends that the court should have overruled the objections because each question concerned a relevant topic within Dr. McGraw's area of expertise.  The

49

State contends that the court properly exercised its discretion to limit the subject of the examination to battered spouse syndrome alone, as distinct from other psychological conditions. The State also contends that at least some of the questions were objectionable either as to form or because of an inadequate foundation. The State argues further that Wallace-Bey suffered minimal prejudice from these rulings because other testimony (including answers elicited on cross-examination and testimony from the State's opposing expert) touched upon some of the same matters.[17]

Because we have reversed the judgments on other grounds, it would be of little utility to discuss in detail the possible grounds for sustaining an objection to each question and the potential prejudice from each ruling. The exact wording of the questions and the context in which they are asked will likely change in a subsequent trial. For the most part, Wallace-Bey's brief discusses these rulings only in general terms, as they relate to the issue of relevance. So shall we.

As explained previously, Wallace-Bey is entitled to offer not only the conclusions of her expert on battered spouse syndrome, but also to present enough information to allow a meaningful evaluation of those conclusions. That goal is particularly critical in a case like this one, where the jury needed to weigh the opinion of the defense expert

---

[17] After advancing a rather narrow view of what areas of discussion were appropriate for the defense expert, the State later took a more expansive approach in eliciting testimony from its own expert. Dr. Tellefsen provided her account of the development of battered spouse syndrome, talked about how post-traumatic stress disorder and depression relate to the syndrome, opined that Wallace-Bey suffered from depression, and opined that she did not meet the criteria for post-traumatic stress disorder.

50

alongside the opposing opinion from the State's expert. At the same time, the trial court still has the responsibility to "exercise reasonable control" (Md. Rule 5-611(a)) over the presentation of the testimony, by excluding evidence that is misleading, unduly confusing, unnecessary, or unfairly prejudicial. *See* Md. Rule 5-403.

We agree with Wallace-Bey that some testimony about "the history of battered spouse syndrome" was relevant, at least to provide background information that would help the jury to understand the expert testimony. By illustration, when the State asked its expert, Dr. Tellefsen, to explain the nature of battered spouse syndrome, Dr. Tellefsen began with a brief account of some of the foundational research. That testimony would have been just as appropriate from a defense expert such as Dr. McGraw. Most likely, Dr. Tellefsen discussed that background to give a logical starting point for understanding the condition, much as the Court of Appeals did in *Smullen*, 380 Md. at 253-57, and *Porter II*, 455 Md. at 236-37. On remand, it would be appropriate for the court to permit some limited testimony from the defense expert about the history of the syndrome.

We also agree that a properly qualified defense expert should be permitted to testify about the relationship between battered spouse syndrome and post-traumatic stress disorder. In support of her argument on the relevance of those subjects, Wallace-Bey points to research about the "strong interconnection" between abuse and post-traumatic stress disorder. For our purposes, we need look no further than the first sentence of *Porter II*, in which the Court of Appeals explained: "Battered spouse syndrome is a form of posttraumatic stress disorder[.]" *Porter II*, 455 Md. at 226; *see also id.* at 237; *Smullen*, 380 Md. at 256. A discussion of post-traumatic stress disorder and its

51

symptoms may be useful, and perhaps even necessary, to explain an expert's opinion about whether a defendant meets the criteria for battered spouse syndrome.[18]

For similar reasons, a qualified expert should be permitted to testify about the association (if any) between battered spouse syndrome and depression where there is evidence that the defendant experienced depression. In this case, the two experts drew different conclusions from Wallace-Bey's history of "major depression." Dr. McGraw opined that Wallace-Bey's depression contributed to her feelings of "hopelessness" and of being "trapped" in her relationship with Whaley. Dr. Tellefsen acknowledged that depression (along with post-traumatic stress disorder) is one of the most common conditions resulting from abuse, but she attributed many of Wallace-Bey's symptoms to the depression that recurred throughout her life, rather than to abuse by Whaley during 2006 and 2007. In these circumstances, expert testimony about the role generally played by depression in battered women would have been highly probative.

On a related point, Wallace-Bey complains that she was not allowed to testify that she received treatment for depression at various points in her adult life. Among other

---

[18] The testimony of Dr. McGraw and Dr. Tellefsen indicates that the terminology for describing what was once called "battered spouse syndrome" has evolved since 1991, when the General Assembly enacted CJP § 10-916. From a court's perspective, the defining feature of expert testimony on "battered spouse syndrome" is not the label used, but that the testimony concerns the recognized "psychological condition" resulting from "repeated physical and psychological abuse" by the defendant's current or former spouse or cohabitant. *See* CJP § 10-916(a)(2). Trial courts should be aware that experts might not always testify about a "battered spouse syndrome" as such, but instead might discuss related symptoms and conditions that are known to result from abuse. For instance, in the *Porter* case, most of the expert testimony on battered spouse syndrome discussed post-traumatic stress disorder and the defendant's depressive disorder. *See Porter II*, 455 Md. at 229; *Porter I*, 230 Md. App. at 300-06.

things, the court specifically ruled that it was irrelevant whether Wallace-Bey sought "counseling or treatment for [her] depression" around the time she ended the initial relationship with Whaley in 1997. Because her depression was a prominent feature in the two expert opinions, we agree with Wallace-Bey that the background testimony about her history of treatment for depression should not be excluded as irrelevant.

Wallace-Bey further contends that Dr. McGraw should have been permitted to testify about "what other psychological conditions Ms. Wallace-Bey might have had, whether Dr. McGraw tested for other psychological conditions, . . . and whether there are certain psychological conditions that make one more susceptible to [battered spouse] syndrome." The record includes no proffer of exactly how Dr. McGraw would have responded to those questions. Hence, it is unclear whether the testimony about "other psychological conditions" would have concerned anything other than post-traumatic stress disorder and depression. Generally speaking, however, testimony about other psychological conditions observed in Wallace-Bey is relevant to the extent that it informed the expert opinions about whether and how the alleged abuse by Whaley affected her. Evidence that she suffered from a particular condition would be especially probative if that condition is known in the medical community to result from abuse or to contribute to the effects of abuse on a person's mental state.[19]

_____

[19] Evidence that Wallace-Bey suffered from a particular condition would also be probative if that condition provides an alternative explanation for her behavior. For instance, Dr. Tellefsen attributed much of Wallace-Bey's behavior to "borderline personality disorder," to the exclusion of battered spouse syndrome. Testimony from Dr.

In sum, where a witness has been properly qualified to give expert testimony about battered spouse syndrome, the trial court generally should permit counsel to inquire about the connection (if any) between battered spouse syndrome and any related psychological conditions, such as post-traumatic stress disorder and depression. The expert testimony may address those connections in general and then in relation to conditions observed in a specific defendant.[20]

## II.    Cross-Examination of Wallace-Bey about the Detective's Credibility

As a separate issue in this appeal, Wallace-Bey contends that the trial court erred by permitting the State to question Wallace-Bey about the credibility of the lead investigator, Detective Lanier.

The challenged ruling arises out of testimony about the statement that Wallace-Bey made to Detective Lanier at the hospital where she was treated for an overdose on

---

McGraw about the other psychological conditions Wallace-Bey may have had was just as probative as Dr. Tellefsen's testimony about other psychological conditions.

[20] Wallace-Bey also argues briefly that the court erred by precluding Dr. McGraw from explaining why she "felt confident that [Wallace-Bey] was not faking her responses to evaluations[.]" Although the court permitted Dr. McGraw to testify about psychological tests used to rule out malingering, the court sustained a general objection when Dr. McGraw commented: "if someone was faking, it would have been hard for them to remember what they said from one interview to another." Wallace-Bey theorizes that the court sustained the objection based on a narrow view of what evidence is relevant to the issue of battered spouse syndrome. In our view, it is more likely that the ruling did not rest on a determination of relevance, but on whether that particular comment, as worded, amounted to Dr. McGraw's opinion about the credibility of another witness, Wallace-Bey. If Wallace-Bey elicits similar testimony on remand, and if the State objects, the court's rulings should take account of the limits on testimony that is tantamount to an opinion vouching for the credibility of another witness. *See generally Brooks v. State*, 439 Md. 698, 727-36 (2014); *Bohnert v. State*, 312 Md. 266, 277-79 (1988).

the night of the shooting.  According to Detective Lanier, Wallace-Bey said that, after Whaley raped her that morning, he eventually "fell asleep," and that she got out of bed and retrieved her gun from her bag while "[h]e was still asleep."  During cross-examination, Detective Lanier added that Wallace-Bey did not say how much time passed, except that she told him that "after they finished she waited for him to fall asleep" before retrieving the gun.

Wallace-Bey later testified that she reached for the gun after Whaley started to press his body against hers again a few minutes after he raped her.  She testified that she saw him "[l]aid back, stroking" his penis when she fired the gun.

On cross-examination, the State attempted to impeach that portion of her testimony.  The following exchange occurred:

> [THE STATE]:  Have you ever given previous testimony that five minutes went by between when you allege he raped you and you shot him?
>
> [WALLACE-BEY]:  I'm not sure how much time it was.  I always said that I did not know the precise time.  The police officers said it was two hours and I said it was more like minutes, not hours.
>
> [THE STATE]:  You told Detective Lanier that [Whaley] was asleep, didn't you?
>
> [WALLACE-BEY]:  No, I did not.
>
> [THE STATE]:  You told Detective Lanier that after the sex you waited a very long time, he might have been asleep; isn't that correct?
>
> [WALLACE-BEY]:  That is incorrect.
>
> [THE STATE]:  Okay.  So if Detective Lanier testified as such you state that he's lying?
>
> [WALLACE-BEY]:  That is correct.

55

[DEFENSE COUNSEL:] Objection.

THE COURT: Basis?

[DEFENSE COUNSEL:] Argumentative.

THE COURT: Overruled.

Wallace-Bey contends that the trial court erred when it allowed the State to question Wallace-Bey about Detective Lanier's credibility. As she points out, "[i]n a criminal case tried before a jury, . . . the credibility of a witness and the weight to be accorded the witness' testimony are solely within the province of the jury[,]" and therefore it is "error for the court to permit to go to the jury a statement, belief, or opinion of another person to the effect that a witness is telling the truth or lying." *Bohnert v. State*, 312 Md. 266, 277 (1988) (citations and footnote omitted); *see also* Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 1303, at 618 (4th ed. 2010) ("it is improper to ask a witness whether another witness was 'lying'"). "Whether a witness on the stand personally believes or disbelieves testimony of a previous witness is irrelevant, and questions to that effect are improper, either on direct or cross-examination." *Bohnert*, 312 Md. at 277 (quoting *Mutyambizi v. State*, 33 Md. App. 55, 61 (1976)).

Wallace-Bey compares the prosecutor's cross-examination of her with the improper cross-examination of the defendant in *Hunter v. State*, 397 Md. 580 (2007). In that case, a detective testified that the defendant confessed to a burglary, but the defendant took the stand and denied making the confession. *Id.* at 584. During the cross-examination of the defendant, the trial court overruled a series of objections to questions about whether that detective and another detective had been lying about the defendant's

56

confession.  *Id.* at 585-86.  The Court of Appeals reversed the defendant's conviction because the trial judge had permitted the prosecutor to ask the defendant whether he believed that police witnesses were lying about his statement to them.  *Id.* at 583.

The Court of Appeals gave several reasons why the trial court erred by permitting the prosecutor to ask the defendant whether the detectives were lying:

> [The defendant] was asked five questions that put him in a position of characterizing the testimony of two other witnesses.  He was asked five "were-they-lying" questions.  These questions were impermissible as a matter of law because they encroached on the province of the jury by asking [the defendant] to judge the credibility of the detectives and weigh their testimony, i.e., he was asked: "And the detective was lying?"  The questions also asked [the defendant] to stand in place of the jury by resolving contested facts.  Moreover, the questions were overly argumentative.  They created the risk that the jury might conclude that, in order to acquit [the defendant], it would have to find that the police officers lied.  The questions were further unfair because it is possible that neither the [defendant] nor the police officers deliberately misrepresented the truth.  These questions forced [the defendant] to choose between answering in a way that would allow the jury to draw the inference that he was lying or taking the risk of alienating the jury by accusing the police officers of lying.  Therefore, the trial court erred in allowing the State to ask [the defendant] "were-they-lying" questions.  When prosecutors ask "were-they-lying" questions, especially when they ask them of a defendant, they, almost always, will risk reversal.

*Id.* at 595-96.

The State concedes here that Wallace-Bey's objection to the question about whether she believed that Detective Lanier was lying "should have been sustained[.]"  The State contends, however, that because defense counsel objected on the ground that the question was "argumentative," Wallace-Bey should be deemed to have waived all other grounds for the objection.  Yet, just as her trial counsel did, Wallace-Bey's brief specifically argues that "the question posed by the State was egregiously argumentative."

57

As Wallace-Bey points out, questions that ask a defendant if she believes that another witness lied are impermissible for many reasons. The Court of Appeals has specifically held that those types of questions are "overly argumentative." *Id.* at 595; *see also id.* at 589 (quoting *State v. Maluia*, 108 P.3d 974, 978 (Haw. 2005)). The question posed to Wallace-Bey during cross-examination ("So if Detective Lanier testified as such you state that he's lying?") was just as argumentative as the substantively identical questions posed to Hunter ("Mr. Hunter, it is your testimony then that [the detective] who just came in here and testified lied, right?"). *Id.* at 585. The trial court should have sustained the objection on the ground specifically stated by defense counsel.

The State also contends that any error in the trial court's ruling should be deemed harmless because, it says, the issue of "[w]hether Whaley was asleep" was "collateral and immaterial" to the issues before the jury. To the contrary, the sequence of events immediately before the shooting was critical to evaluating whether the killing was justified or mitigated. *See Smullen*, 380 Md. at 257-58 (noting that defendants face greater difficulty in connecting battered spouse syndrome evidence to a self-defense claim if a killing occurs in a "non-confrontational" setting, "where the defendant kills her partner while he is sleeping or otherwise distracted or incapacitated" rather than "in response to a contemporaneous physical attack"); *see also id.* at 265. The State's closing argument here relied heavily on Detective Lanier's testimony about Wallace-Bey's statement that Whaley was asleep when she retrieved the gun, which was the only testimony to the effect that Whaley was asleep. The State specifically mentioned the detective's testimony twice. Then it argued on three instances that the jury should reject

58

Wallace-Bey's self-defense theory because Whaley could not have posed any threat while asleep. More broadly, the State emphasized the inconsistencies between Wallace-Bey's trial testimony and Detective Lanier's account of her statement when it encouraged the jury to reject all of her testimony about abuse. In sum, the improper questioning touched upon a crucial feature of the State's theory of the evidence, as well as a credibility issue that was central to Wallace-Bey's defense.

It is true that the prejudicial effect of the improper questioning is not as obvious as it was in *Hunter*, 397 Md. at 596-97. There, the prosecutor posed five "were-they-lying" questions (*id.* at 595), the prosecutor repeatedly argued that the jury would need to conclude that the detectives were lying in order to credit the defense case (*id.* at 587), and the jury sent four notes during deliberation, at least one of which may have related to the improper questioning. *Id.* at 597. Nonetheless, we need not decide whether the error in overruling the objection to that one question requires reversal, because Wallace-Bey is entitled to a new trial as a consequence of the trial court's erroneous hearsay rulings.

During the retrial, the prosecutors should not ask Wallace-Bey or any other witness whether they believe that Detective Lanier or any other witness was lying. Moreover, upon a timely objection, the trial court should not permit any testimony to that effect to go to the jury.

## CONCLUSION

Wallace-Bey is entitled to a new trial at which she may present evidence in accordance with the reasoning of this opinion.

The trial court committed reversible error through its rulings that required

Wallace-Bey to present her entire defense case, including evidence of abuse by Whaley, without mentioning anything that he allegedly said to her. On remand, Wallace-Bey may testify about the actual words spoken to her by Whaley to show how those words affected her. Moreover, a properly qualified expert on battered spouse syndrome may disclose Wallace-Bey's reports of words that Whaley said to her if those reports formed the basis for the expert's opinion.

Evidence that Wallace-Bey suffered abuse by persons other than Whaley is not barred by CJP § 10-916, nor is that evidence irrelevant. Evidence about abuse that Wallace-Bey suffered by persons other than Whaley is admissible to the extent that it forms the basis of an expert opinion about how that abuse affected her psychological condition during the relationship with Whaley and how that abuse affected her mental state at the time of the killing.

Testimony about how battered spouse syndrome relates to other psychological conditions, including post-traumatic stress disorder and depression, and about whether and how Wallace-Bey experienced those related conditions, should not be excluded as irrelevant.

Finally, upon a timely objection, the court should not permit any witness to be questioned about the credibility of any other witness.

> **JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**